**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MATTHEW BEHNE, *Plaintiff,* v. UNION COUNTY COLLEGE, MARIS LOWN, ALLISON KELLISH, JO-ANN DAVIS-WAYNE. NEGAR FARAKISH, PATRICIA CASTALDI, et al, *Defendants.* | Civil Action No. 14-6929 (JMV) (MF) **OPINON** |

**John Michael Vazquez, U.S.D.J.**

Currently pending before the Court is Defendants' motion for summary judgment. D.E 42. This case concerns Plaintiff Matthew Behne, a student who was formerly enrolled in Union County College's ("UCC") Physical Therapy Assistant Program, but was dismissed from the program in 2013. Plaintiff argues that in terminating him, the college breached its contract with him. Plaintiff also asserts numerous additional causes of action. The Court reviewed submissions made in support of the motion and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, the Defendants' motion is **GRANTED** in part and **DENIED** in part.

### I.    Factual Background & Procedural History

The following facts are taken from the parties' respective statements of material fact and documents annexed thereto.[1] Plaintiff began UCC's Physical Therapy Assistant ("PTA") Program

---

[1] Defendants' Statement of Undisputed Material Facts, D.E. 44, referred to hereinafter as

("the Program") in January 2012. Defendants' SOMF at ¶1. The Program is designed to train PTAs who will ultimately work under the supervision of licensed physical therapists. *Id.* at ¶6. The Program itself involves both classroom-based and clinical courses. *Id.* at ¶8. The clinical courses involve students assisting physical therapists with actual patients at affiliated clinical sites. *Id.* at ¶¶24, 26. Termination from a clinical affiliate results in an "automatic failure" of the clinical course. *Id.* at ¶30.

Three documents outline the Program's policies and procedures: (1) the Union County College PTA Handbook ("PTA Handbook"); (2) the Union County College PTA Program Clinical Education Handbook ("Clinical Handbook"); and (3) the Union County College Student Handbook ("Student Handbook"). *Id.* at ¶¶12-13.[2] Students are expected to know the contents of all three handbooks. Defendants' SOMF at ¶15. Plaintiff signed forms that acknowledged his receipt of the PTA Handbook. *Id.* at ¶14.

The PTA Handbook states in pertinent part:

> The following actions will be taken if a student demonstrates behaviors inconsistent with the criteria established in these documents:
>
> 1. When behavior is perceived as being inappropriate the student will be given feedback regarding the inappropriate behavior(s) and be provided with relevant expectations for remediation. This feedback can be provided by faculty and/or clinical educators. The student

---

"Defendants' SOMF," and Plaintiff's Counter-Statement of Undisputed Material Facts, D.E. 45, referred to hereinafter as "Plaintiff's SOMF." Note that Plaintiff's SOMF is not consecutively numbered throughout.

[2] Defendants argue that all three handbooks contain "disclaimers" because each indicates that they are "subject to change." Brief in Support of Defendants' Motion for Summary Judgment, D.E. 42, (hereinafter "Defendants' Brief"), at pg. 4-5. First, the language does not constitute a disclaimer; instead it merely indicates that UCC may change the contents of the handbooks in the future. Second, Defendants never explain the legal effect of their "disclaimer" assertion. In any event, the Court does not consider such language ("subject to change") to constitute a sufficient disclaimer as to the applicability of the handbooks.

will be expected to remediate the behavior as advised.

2. In the academic setting, if a change to more appropriate behavior(s) does not occur, *a formal learning contract* between Union County College and the student will be developed. This learning contract will be developed by the student with the guidance from the appropriate faculty member(s).

3. *Automatic dismissal* from the PTA program will result for the following instances:

   a. Conduct that constitutes harassment or abuse of or discrimination against peers, faulty, patients and others
   b. *Failure to provide a safe and secure environment for patients and peers*
   c. Participation in academic coursework while under the influence of an illegal substance that impairs the ability to do so safely
   d. Participation in academic coursework while under the influence of an illegal substance and/or alcohol
   e. Breach of confidentiality
   f. Failure to comply with learning objectives set forth in a formal learning contract between Union County College and the student
   g. Violation of the student regulations of Union County college or PTA program

Exhibit G to the Certification of Micci J. Weiss, Esq., D.E. 42-2 (hereinafter "Weiss Cert.") at pg. 25 (emphasis added). The PTA Handbook incorporates the American Physical Therapy Association Code of Ethics.[3] *See* Ex. G. to Weiss Cert. at pg. 30.

---

[3] The Code of Ethics provides in part:

STANDARD 1 – Physical therapist assistants provide services under the supervision of a physical therapist.

1.1 Supervisory Relationships – Physical therapist assistants shall work under the supervision and direction of a physical therapist that is properly credentialed in the jurisdiction in which the physical therapist practices.

1.2 (A) Physical therapists assistants may not initiate or alter a treatment program without prior evaluation by and approval of the supervising physical therapist.

The Clinical Handbook states in pertinent part as follows:

> In situations where patient/client and/or staff safety are considered compromised, *immediate termination of the clinical experience may occur.*
>
> The ACCE [Academic Coordinator of Clinical Education] may terminate a clinical experience at any time if it is felt that the student will be unable to meet the course objectives. Prior to termination, the student must have been given written notice that he/she is in danger of failing. This notification must include *an educational contract* with specific learning objectives.

Ex. H to Weiss Cert. at pg. 16 (emphases added).

The Student Handbook, in turn, states in pertinent part:

> Physical Therapist Assistant Program
>
> Once accepted into the PTA program, all PTA courses must be completed in sequence with a grade of C+ or higher. If the student fails or withdraws from a PTA course, he/she will not be allowed to continue in the PTA program. The student must request program re-entry from the Program Coordinator. All policies for re-entry are described in the PTA program handbook.
>
> Behavior for which Students Shall be Subject to Disciplinary Action
>
> (1) Any student who is guilty of continued and willful disobedience or of open defiance of the authority of any instructor or person having authority over him or her, or the use of profanity or obscene language, or defacing any College property shall be liable to punishment including suspension or expulsion from the

---

> . . .
>
> STANDARD 4 – Physical therapist assistants provide services within the limits of the law.
>
>> 4.1 Physical therapy assistants shall comply with all aspects of law. Regardless of the content of any law, physical therapist assistants shall provide services only under the supervision and direction of a physical therapist that has the proper credentials in the jurisdiction in which the physical therapist assistant practices. Ex. G to Weiss Cert. at pg. 32, 34.

4

College.

(2) A threat to the personal safety of self or other students. When a faculty or staff member has reason to believe that a student is or may become a threat to personal safety or self, other students, or staff, that faculty or staff member should immediately notify the Office of the Dean of Students. Failure of the student to cooperate may result in disciplinary action and/or expulsion from the College. An immediate threat to personal safety should be reported directly to the Public Safety Office.

*Student Disciplinary Process* – Step 1: Review Process . . .The student will be afforded the following:

1. Written notification of the charges sent by certified mail to the student address of record or by verbal notification by the Public Safety Office when appropriate.
2. Sufficient notice of the time and place of a disciplinary conference.
3. The right to have an advisor present.
4. The right to a translator/sign language interpreter/note taker, if necessary.
5. The right to view pertinent documents.
6. The right to be informed of the outcome of any disciplinary conference . . .

*Step 3: Appeal Process* – The student may appeal through a formal Hearing by notifying the Disciplinary Conference Officer, in writing, within ten working days of notification of the decision.

Ex. M to the Certification of Matthew Behne, D.E. 46 (hereinafter "Behne Cert.") at pg. 22, 24 (emphases added).

Defendant Allison Kellish, a senior professor and ACCE of the Program, met with Plaintiff "on numerous occasions" to discuss what she perceived to be his inappropriate behavior. *Id.* at ¶40, Complaint, D.E. 1 (hereinafter "Complaint" or "Compl.") at ¶5. Those behaviors included placing his personal items on faculty desks and classroom podiums, personal space issues, being disrespectful to other students, using office supplies that belonged to college staff, and having emotional outbursts during exams. *Id.* at ¶¶42-45. Generally, Kellish worried that Plaintiff did

not have the appropriate interpersonal skills or professionalism to successfully complete the Program. *Id.* at ¶38. Kellish met with Plaintiff in June 2012 to discuss the behavioral issues and to help him manage his stress. *Id.* at ¶45.

In October 2012, Kellish visited an off-site clinical affiliate, Waterview Center Clinic ("Waterview"), after two of its employees notified her that Plaintiff had acted inappropriately during his rotation there. *Id.* at ¶53. They reported that Plaintiff called his clinical instructor outside business hours, stayed at the clinic after therapy hours were over, and brought his instructor coffee after being told he should not. *Id.* at ¶54. Kellish then held another meeting with Plaintiff and two Waterview employees, where Plaintiff signed a learning contract, in which he agreed to several specific strictures on his behavior.[4] *Id.* at ¶¶55-57. Plaintiff disputes that this was a true learning contract, and instead states that the title of the document was rather "Matt's Behavioral Objectives," which were determined without his input. Plaintiff's SOMF at ¶56. However Plaintiff does state that the contract "served its function," in that he completed his rotation at Waterview successfully. *Id.* at ¶3, Defendants' SOMF at ¶59. During Plaintiff's deposition, Defendants' attorney asked: "As a result of the meetings that you had with Dr. Kellish and with the people at Waterview, was a learning contract created for you?", to which Plaintiff responded: "Yes." Ex. I to Weiss Cert. at 155:21-25. Yet, Plaintiff contended that he did not draft the contract and that he did not agree that he suffered from the stated deficiencies.

Dr. Kellish then requested copies of Plaintiff's journal, which he was required to maintain for each clinical rotation. *Id.* at ¶¶60 & n. 5. Plaintiff states that Kellish "reviewed Plaintiff's journals without his consent or authorization." Plaintiff's SOMF at ¶60. After reading Plaintiff's

---

[4] The document stated that, for instance: "[Plaintiff] will maintain professional boundaries with his CI [clinical instructor] 100% of the time. He will not call or text his supervisor under any circumstance." Ex. O to Weiss Cert.

journal, Kellish became concerned "for Plaintiff and others' well-being and safety." Defendants' SOMF at ¶61. In the journal, Plaintiff wrote: "Is swear to God I'm gonna punch that guy right in the f-----g mouth!!", "I felt out of control many times and under the gun," and "I despise feeling sad + despondent all of the time . . . I do what I am told but still the mental anguish remains." *See* Ex. P to Weiss Cert. In December 2012, Dr. Kellish met with Plaintiff and Defendants Negar Farakish and Patricia Castaldi, to discuss the journal. *Id.* at ¶63, Compl. at ¶¶7-8. Farakish was the Provost and Assistant Vice President for Academic Affairs at UCC, and Patricia Castaldi was the Director of Practical Nursing at UCC. During the meeting, Plaintiff said "people follow rules or people die." *Id.* at ¶65. Kellish, Farakish, and Castaldi insisted that Plaintiff meet with a school counselor and his therapist before he started his second clinical rotation. *Id.* at ¶66.

After the meeting, Kellish sent Plaintiff a letter that stated, among other things:

> Based on your current behavior in class and clinic, and written statements in your reflective journal you are not consistently exhibiting behavior that presents your ability to handle the rigors or clinical rotations and achieve the criteria for professional behavior and generic abilities as outlined in the program handbook.
>
> …Any issues in your ability to consistently 100% of the time exhibit generic abilities and professionalism during clinical rotations will be dismissal from the program.

Ex. Q to Weiss Cert. Plaintiff claims that at no point during the meeting was his dismissal discussed. Plaintiff's SOMF at ¶71. Plaintiff's therapist provided a letter stating Plaintiff should be allowed to continue in the Program. *Id.* at ¶12. Kellish met with Plaintiff again in December 2012 to discuss an academic integrity violation. Defendants' SOMF at ¶70. Plaintiff ultimately received a zero on the assignment. *Id.* at ¶71.

Plaintiff began another clinical rotation in March 2013 at the Wayne Orthopedic Physical Therapy clinic ("Wayne Clinic"). *Id.* at ¶72. On March 20, Plaintiff's second day at the clinic, the Wayne Clinic dismissed Plaintiff. *Id.* Dr. Kellish learned of Plaintiff's dismissal when he

called her that morning; during that call she told him they would meet to discuss his dismissal on campus once she learned more from the clinic. Ex. B. to Weiss Cert. at pg. 159: 9-18, pg. 161: 10-20.

The Wayne Clinic, through Ms. Noon, sent the following email to Dr. Kellish:

> On his first day *Matt displayed some behavior that was not in line with the way we need things done. Specifically, he inappropriately questioned many of our methods* (noting he preferred the way Kessler did it --- as you know, we're pretty much the opposite of Kessler in philosophy, so it makes sense why things were different), *resisted his CI's guidance, and there were some awkward moments where questions were asked, thoughts were stated and/or things were done in front of patients that shouldn't have been, despite my having gone this exact issue with him in orientation prior to his first day.* Dr. Benedetto, one of our clinic managers and acting CI, had several direct dialogues with him, letting him know that it was up to Matt whether he stays or chooses to go find somewhere else to affiliate. If he was to stay he needed to accept guidance, not question our methods, and slow things down, trusting that when we felt he was ready we would progress him clinically.
>
> Everything went well for the rest of the day and it was clear Matt was trying. We were optimistic that it could still work out. *Unfortunately, though, today one of our staff let us know that she had situation where Matt, without being cleared to do so by the clinic managers, insisted on setting up a patient.* Basically doing things his way instead of following the guidance his CI had given him the previous day regarding allowing us to set the pace and trusting in our guidance. As you know, the student needs to be open to and accept our methods, where we have them focus mainly on patient relationships before we allow them to put their hands on a patient. This in itself is valuable clinical guidance and needs to be followed without question.
>
> *Unfortunately, we need to end the affiliation with Matt today – when we dialogued with him about setting up this patient without authorization, he told a story about someone asking him to set up the patient.* This is not possible, as we asked the staff, and our entire staff knew that everything Matt did needed to go through Frank first and Frank did not give the direction that Matt should set up patients.

Ex. R to Weiss Cert. (emphases added).

Dr. Kellish also spoke with the coordinator, Noon, that day, but is unsure if she spoke to her before or after receiving the email. Ex. B. to Weiss Cert. at 173:20-23. However, when Kellish did speak with Noon, Noon did not say that Plaintiff was dismissed for reasons of patient safety and Kellish did not recall if Noon indicated that Plaintiff had actually touched the patient. *See* Ex. A. to Behne Cert. at 176: 11-17.

Kellish forwarded the email message from the Wayne Clinic to Castaldi and wrote: "FYI. Can I use this to dismiss him at this point?" Ex. N. to Behne Cert. Castaldi replied:

> As we discussed, he has ongoing issues that are precluding him from practicing in a safe and appropriate manner within the clinic environment. Send me the statement from your handbook that addresses dismissal and we can connect the dots.

*Id.*

Plaintiff states that he "never set up a patient at the Wayne Clinic." Plaintiff's SOMF at ¶72. In a call to Kellish, Plaintiff indicated that he had been dismissed for asking a physical therapist "questions about certain techniques in front of a patient." *Id.* at ¶74. In a subsequent email, Plaintiff said that he "was dismissed from clinic because I violated their rules of interaction and failed to follow their timeline and methodology of training." Ex. S to Weiss Cert.

As a result of his termination from the Wayne Clinic, Kellish dismissed Plaintiff from the Program. *Id.* at ¶88. On April 2, 2013, Plaintiff met with Kellish and Castaldi, where he was informed of his dismissal, and Dr. Kellish explained why he was being dismissed. *Id.* at ¶89, Ex. C. to Weiss Cert. at pg. 58-59. Before that meeting, Plaintiff was asked to write a reflection "about what he thought—what happened and what he would do in the future to be successful." Ex. B to Weiss Cert. at 184:15-18. Dr. Kellish testified that she was certain Plaintiff would need to be dismissed once she heard from the clinic that there had been a safety issue with the patient set up, but she also stated she did not decide until the day of the meeting. *Id.* at 184: 7-24. Plaintiff requested a different placement in another clinic, but Kellish denied the request. Plaintiff's SOMF

at ¶31. It is not clear if Plaintiff was asked any questions or permitted to give his version of events at the April 2nd meeting. Plaintiff made a formal appeal request on April 15, 2013. *Id.* at ¶36. This request was never responded to. *Id.* at ¶40.

Plaintiff filed his Complaint on November 5, 2014. D.E. 1. The Complaint charges UCC[5]; Maris Lown, the Assistant Vice President for Academic Affairs; Dr. Kellish; Jo-Ann Davis Wayne, the Dean of Students; Dr. Negar Farakish; Dr. Castaldi; and various unnamed persons and entities (collectively "Defendants"). Compl. at ¶¶3-10. Count I charges all defendants with violations of 42 U.SC. §1983 for violation of Plaintiff's "First, Fifth, Fourth, and Fourteenth Amendment[]" rights; Count II is for the same violations under the New Jersey Constitution; Count III is for "arbitrary and capricious" actions; Count IV is for breach of contract; Count V is for quasi-contract breach; Count VI is for implied contract breach; Count VII is for abuse of process; Count VIII is for discrimination under the New Jersey Law Against Discrimination ("LAD"); Count IX is for hostile education environment; Count X is for promissory estoppel; Count XI is for negligence; Count XII is for misrepresentation; Count XIII is for intentional and negligent infliction of emotional distress; Count XIV is for aiding and abetting violations of the LAD. *Id.* at ¶¶95-252

Defendants answered the Complaint on January 6, 2015. D.E. 7. A number of conferences on scheduling and settlement have been held in front of Judge Falk. *See* D.E. 13-41. Discovery has concluded. *See* D.E. 39. Defendants filed the instant motion for summary judgment on January 6, 2017. D.E. 42. Plaintiff filed his opposition on February 6, 2017. Defendants replied on February 21, 2017.

---

[5] Union County was initially named as a Defendant, but it has since been dismissed from the case. D.E. 16.

## II.     Standard of Review

Summary judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the

court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III. Analysis

#### a. Contract Claims

It is clear that Plaintiff was not an easy student. His behavior ranged from the odd (such as personal space issues) to the disruptive (such as emotional outbursts during an exam and being disrespectful to other students) to the concerning (such as discussing thoughts of violence toward others) to the defiant (disobeying instructions at both the Waterview and Wayne Clinics). Thus, the Court is sympathetic to Defendants' plight. However, the question remains whether Defendants are entitled to summary judgment.

Plaintiff's contract claims are based on the argument that UCC violated its own policies by dismissing him. Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Opposition"), D.E. 48, at pg. 11. Defendants argue that no contract existed between UCC and Plaintiff, and that Plaintiff's dismissal was justified by their written policies and procedures. Defendants' Brief at pg. 4-5. Specifically, Kellish's December 2012 letter stated that Plaintiff would be dismissed if he was unable to meet the goals set by the Program, including "generic abilities and professionalism" during his clinic rotation. Ex. Q to Weiss Cert. Defendants also contend that the PTA and Clinical Handbooks provide for automatic dismissal in the case of a safety violation, which they allege occurred during Plaintiff's rotation at the Wayne Clinic.

Defendants' Brief at pg. 13-14.

Plaintiff argues that Defendants failed to follow their own procedures in several respects, thus violating the agreements between UCC and Plaintiff. First, Plaintiff asserts, Defendants drafted the alleged learning contract without his participation, and now claim that it applied to both clinical rotations at Waterview and Wayne. Opposition at pg. 12. Plaintiff adds that the Clinical Handbook permits a student's dismissal from a clinical rotation, but it does not allow termination from the Program without further investigation by the college. *Id.*, Plaintiff's SOMF at 16-18, 27. Plaintiff continues that he was also not granted any chance to appeal his dismissal from the Program, as is provided for in the Student Handbook. Opposition at pg. 13.

Although a student may bring a claim for breach of contract against his or her university, "a student's contract claim arising from a public university's disciplinary process is not adjudicated under strict contract principles." *Collick v. William Paterson Univ.*, 2016 WL 6824374, at *22 (D.N.J. Nov. 17, 2016); *see also Hernandez v. Don Bosco Preparatory High*, 322 N.J. Super. 1, 17 (App. Div. 1999). However, "New Jersey recognizes an implied agreement between students and universities." *Mucci v. Rutgers*, 2011 WL 831967, at *19 (D.N.J. Mar. 3, 2011). Much like a student's claim for lack of procedural due process, a higher education institution must guarantee a "fair procedure" to protect against "arbitrary or capricious decision making," including "adequate notice of deficiencies," an "opportunity to examine evidence of those deficiencies," and the "right to present a case to the decision-making authority." *Mittra v. Univ. of Med. & Dentistry of N.J.*, 316 N.J. Super. 83, 91-92 (App. Div. 1998). If the student cannot produce evidence that the school "deviated in some significant way from its published rules and regulations . . . [a] mere conclusory allegation . . . that appropriate procedures were not followed [is] insufficient to withstand summary judgment." *Id.* at 92.

Here, there is a genuine issue of material fact about whether there was a significant deviation from UCC and the Program's stated requirements. First, Plaintiff claims that the learning contract signed during his first clinic rotation applied only to his time at Waterview, and it was not intended as to apply to all subsequent clinical rotations. Despite Defendants' protestations, it is not clear from the document or the record that the contract was intended to cover all future clinical rotations for Plaintiff. Indeed, the contract was written to address specific conduct issues at Waterview. In addition, the "learning contract" in the PTA Handbook refers to the "academic," not clinical, setting. The Clinical Handbook, in turn, provides for an "educational contract" but it is limited to situations in which a student is in danger of failing.

Second, Defendants' brief focuses mainly on the safety violation at the Wayne Clinic, but Plaintiff does not dispute the *clinic's* ability to terminate him, as opposed to the *school's* ability to do so. The Clinical Handbook clearly states that the clinical experience can be immediately terminated if a patient's safety is compromised. Plaintiff objects because UCC did not perform an adequate investigation of what occurred at the clinic. For instance, it is not clear if Kellish sent the email to Castaldi before she had an opportunity to speak with the Wayne Clinic supervisor or after.[6] Ex. N to Behne Cert. (noting the time stamps between the initial email from the Wayne Clinic and the forwarded message to Castaldi shows only four minutes between the messages). If Kellish acted solely on Wayne Clinic's email, then Kellish's actions can be reasonably interpreted as indicating that she had already decided to try to terminate Plaintiff from the Program based on the email from the Wayne Clinic alone, *i.e.* without performing any substantive follow-up with either the Wayne Clinic or Plaintiff.

---

[6] Dr. Kellish could not recall whether she spoke to the Wayne Clinic before or after forwarding the email to Dr. Castaldi. *See* Ex. B to Weiss Cert at 173: 20-22. However, in forwarding the email, Dr. Kellish did not refer to a conversation with Wayne Clinic.

Moreover, it is unclear whether an actual safety violation happened; Plaintiff insists that he did not "set up" a patient, while the Wayne Clinic director wrote to Kellish that he did. However, even assuming that Plaintiff "set up" a patient without approval, Defendants have not demonstrated how this action compromised the safety of the patient. Dr. Kellish testified that the clinic reported Plaintiff initiated set up of an "e-stim," or electrical stimulation, to a patient while at the Wayne Clinic, by "going to get the electrodes." Ex. B to Weiss Cert. at 169-170. Dr. Kellish described this as a safety concern, even if Plaintiff "had not touched the patient," or if he had started the set up and was told to stop. *Id.* at 171. Yet, it is not clear to the Court how Plaintiff's actions jeopardized patient safety if he never touched the patient, and Dr. Kellish did not provide a sufficient explanation in this regard. Moreover, Plaintiff denies that this occurred. Ex. B to Behne Cert. at 205-206. Plaintiff does state that he "was signed off as proficient on, and was practicing, all modalities, within his scope of practice, including hot/cold packs, & 'e-stim,' at least seven months prior to" his dismissal. Plaintiff's SOMF at ¶21.

In addition, it is not clear in reading the email from the Wayne Clinic that the clinic dismissed Plaintiff for patient safety concerns. Instead, the email can be reasonably read as indicating that the Wayne Clinic dismissed him because the clinic had had difficulty with him on the first day and then did not believe Plaintiff's explanation as to the patient "set up" on the second day. Again, such action by the clinic was acceptable, but it is not clear that from the email that the dismissal related to patient safety. In fact, when she spoke with the clinical coordinator from the Wayne Clinic, Kellish admitted that the coordinator did not mention patient safety issues.

Third, while Plaintiff was asked by Dr. Kellish on the day of his dismissal from the clinic what occurred that precipitated his dismissal, it does not appear that he was given a chance to provide his version of events once UCC decided to terminate him from the Program. *Mittra*, 316

N.J. Super. at 91-92. Instead, he was called into a meeting with Kellish and Castaldi on April 2, 2013 and informed that he was being released from the Program. In fact, Dr. Kellish testified that she had not definitively decided to dismiss Plaintiff from the Program until the day of the meeting, although it is not clear what caused her to reach the decision. As a result, if Dr. Kellish was unsure of whether she was going to release Plaintiff from the Program, then Plaintiff could not have known of a decision that had not yet been made. At a minimum, there is a genuine issue of material fact as to whether Plaintiff was given the opportunity to provide his side before the decision to dismiss him was made and he was so advised.

Plaintiff also notes that despite his request, he was not given an opportunity to appeal his dismissal from the Program, as is specifically provided for in the Student Handbook. Defendants argue that the PTA Handbook appeals process applies, not the Student Handbook's. According to Defendants, the Student Handbook appeal process applies when the student has been reported to the Public Safety Division, which was not done here.[7] The PTA Handbook states:

> In the case of flagrant and intentional violations of the Professional Code of Ethics, a student may be removed without previous warning at any time in his or her academic career.
>
> In general, program decision regarding academic standing are final. A decision may be appealed only if the student can show that:
>
> 1. There was an error in the procedure used by the faculty
> 2. There is new evidence sufficient to alter the decision
> 3. Or the sanction imposed was not appropriate to the severity of the violation of processional or academic standards.

Ex. G to Weiss Cert. at pg. 117.

---

[7] The Student Handbook appeal process is described in the section titled "Student Disciplinary Process," which is performed through the Dean of Students and a designated "Disciplinary Conference Order." The procedure includes review, a disciplinary conference, and then an appeal. *See* Ex. M to Behne Cert. at pg. 24.

Even if only the PTA Handbook appeals process applies, Plaintiff has still raised a genuine issue of material fact precluding summary judgment. He argues that there was an error in procedure in that Kellish and other administrators failed to do a proper investigation of his conduct at the Wayne Clinic, and that there is potentially new evidence in that he denies any safety issue occurred. Because Plaintiff never got to explain or present his side of the story (or, alternately, there is a genuine issue of material fact as to whether he was permitted), there is an issue of fact about the "new evidence" that could be presented. Clearly, Plaintiff should have been able to address UCC's concerns directly before he was terminated from the Program. Of course, if it turns out that patient safety was not compromised, then the sanction imposed (termination from the Program) would not be commensurate with severity of the violation.

Thus, Plaintiff has raised genuine issues of material fact as to his breach of contract claims regarding the scope of learning contract, the propriety of the dismissal from the Wayne Clinic as a justification for his dismissal from the Program, UCC's notice to him and his ability to be heard, and as to whether he was provided an appropriate appeal. As a result, there are genuine issues of material fact as to whether there was a significant deviation UCC and the Program's requirements in terminating Plaintiff from the Program. For this reason, summary judgment on the contract claims, Counts IV, V, VI and X, is denied.

### b. Negligence & Fraudulent Misrepresentation

Defendants indicate that they are entitled to summary judgment on Plaintiff's negligence and fraud claims because they are entitled to summary judgment on the contract claims. However, because the Court is not dismissing the contract claims, and the negligence and fraud[8] counts, XI

---

[8] Plaintiff pleads this claims as "misrepresentation" but lists the elements of fraud in their Reply. *See* Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, D.E. 48, at pg. 16.

and XIII, survive as well.

### c.  Abuse of Process

The elements of an abuse of process claims are: "first, an ulterior purpose, and second, a willful act in the use of this process not proper in the regular conduct of the proceedings." *Barletta v. Golden Nugget Hotel Casino*, 580 F.Supp. 614, 640 (D. N.J. 1984) (citing Prosser's *Law of Torts*).  Plaintiff does not point to any evidence creating a material issue of fact as to improper use of process by Defendants.  Therefore, Count VII is dismissed.

### d.  Intentional & Negligent Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, Plaintiff must prove three elements: (1) intentional and outrageous conduct on the part of the defendant; (2) proximate cause, *i.e.* that defendant's actions caused emotional distress; and (3) severe emotional distress. *Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 366 (1988).  The emotional distress must be "so severe that no reasonable man could be expected to endure it." *Id.*  To establish a claim of negligent infliction of emotional distress, Plaintiff must show (1) that defendant owed a duty of reasonable care to him; (2) "defendant breached that duty; (3) [he] suffered severe emotional distress; and (4) defendant's breach was the proximate cause of the injury." *Dello Russo v. Na*gel, 358 N.J. Super, 253, 269 (App. Div. 2003).

As Defendants point out, Plaintiff cites no legal support for establishing either tort based on dismissal from an academic program.  Additionally, Plaintiff has failed to provide sufficient evidence of emotional distress.  He merely indicates that he has continues to see his therapist, which he was doing before his termination from the Program.  This is insufficient.  Additionally, UCC cannot be held liable for willful or intentional misconduct of an employee.[9]  *See* N.J.S.A.

---

[9] Defendants do not raise this point as to the fraudulent misrepresentation claim, so the Court

59:2-10; *Seal Tite Corp. v. Bressi*, 312 N.J. Super. 532, 538 (App. Div. 1998). Thus, Count XIII is dismissed.

### e. Due Process[10]

#### i. Procedural Due Process

The essence of a procedural due process claim is "notice and an opportunity to be heard." *Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015). In the context of a university's decision-making as to its students, there is a difference in the amount of due process required for academic actions as opposed to disciplinary actions. *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 88 & n.4 (1978) ("There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals." (internal quotation marks omitted)). "When a student is discharged for academic . . . reasons, all that is required to satisfy procedural due

———————————

will not address it *sua sponte*.

[10] Plaintiff's Due Process claims are brought pursuant to 42 U.S.C. §1983, which provides a vehicle for vindication violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). 42 U.S.C. § 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

In order to state a valid claim for relief under Section 1983, a plaintiff must first allege a violation of a right secured by the Constitution or laws of the United States and, second, a plaintiff must contend that the violation was caused or committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Neither party argues the Section 1983 standard in their briefing, rather they interpret the relevant constitutional standards under the Fourteenth Amendment Due Process Clause. As a result, the Court focuses on the constitutional provision. Moreover, although the initial allegations also assert violations other constitutional provisions, neither party addresses those provisions.

process is 'an informal faculty evaluation with the student.'" *Kadakia*, 633 F. App'x at 88 (quoting *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 51 (3d Cir. 1986)). Similarly, in regard to disciplinary actions, a "formal hearing" is not required. *Horowitz*, 435 U.S. at 85. However, there must at least be an "informal give-and-take" between the student and the school that provides the student with "the opportunity to characterize his conduct and put it in what he deems the proper context." *Id.* at 86 (quoting *Goss v. Lopez*, 419 U.S. 565, 584 (1975)). In evaluating whether procedural due process has been satisfied, the Supreme Court has "frequently emphasized that 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Id.* (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)).

Plaintiff here raises genuine issue of material fact as to whether he was given an opportunity to be heard after he was dismissed from the Wayne Clinic. While Defendants repeatedly indicate that Plaintiff was provided a "formal meeting," Defendants' Brief at pg. 24, there are genuine issues of material fact as to what the meeting consisted of and whether Plaintiff had the opportunity to at least answer the allegations against him. In this regard, the Court refers to the analysis of the termination meeting discussed above in the Contract Claims section. Because there are genuine issues of material fact as to whether Plaintiff was given proper notice of the anticipated termination and as to whether Plaintiff was allowed an opportunity to be heard, summary judgment as to Counts I and II, the federal and state constitutional claims, is denied.

### ii. Substantive Due Process

Initially, the Court notes that the Third Circuit "has strongly suggested that the right to continued graduate education is not protected by substantive due process." *Manning v. Temple Univ.*, 157 F. App'x 509, 514 (3d Cir. 2005); *see also McMahon v. Rutgers*, No. 11-02306, 2013

WL 5937416, at *9 (D.N.J. Nov. 4, 2013), *aff'd sub nom. McMahon v. Salmond*, 573 F. App'x 128 (3d Cir. 2014) (stating that the court is "skeptical" that the plaintiff "has a constitutionally protected interest in his continuing enrollment in a graduate-level nursing program"). To demonstrate a violation of substantive due process, a plaintiff is "required to show that he was deprived of a fundamental property right through an arbitrary and deliberate abuse of authority." *Kadakia*, 633 F. App'x at 87. Substantive due process rights are narrower in scope than the rights protected by procedural due process. *Mucci v. Rutgers*, No. 08-4806, 2011 WL 831967, at *18 (D.N.J. Mar. 3, 2011).

In the context of academic decisions, the Supreme Court has cautioned that courts reviewing those decisions "should show great respect for the faculty's professional judgment." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985). Put simply, courts "may not override [a university's decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* The Supreme Court in *Ewing* assumed, without deciding, that there was a property interest in continuing enrollment (there in a medical school)—neither it nor the Third Circuit has recognized this right in subsequent case law. *See Van de Zilver v. Rutgers University*, 971 F.Supp. 925, 934; *Bell v. Ohio State University*, 351 F.3d 240, 251 (6th Cir. 2003) (declining to find "an interest in [] continuing enrollment" in a medical school). Because no higher court has clearly recognized the right asserted by Plaintiff, the Court will grant Defendants' motion for summary judgment as to Plaintiff's substantive due process claim.

### f. Arbitrary & Capricious

Plaintiff's "arbitrary and capricious" claim must be dismissed as this is a legal standard, not an independent cause of action. *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, 2012

WL 762498, at *10 (D.N.J. Mar. 6, 2012). Count III is dismissed.

### g. LAD

Plaintiff's claim under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-12, is that UCC failed to reasonably accommodate his disability. The elements of such a claim are: (1) plaintiff is disabled, (2) his requests for accommodations were reasonable, and (3) that those requests were denied. *See Mucci*, 2011 WL 831967, at *21. Plaintiff here has failed to allege that he ever advised Defendants that he was disabled, much less that he asked for an accommodation. All parties agree that Plaintiff was undoubtedly suffering from stress, but Plaintiff cites to no case finding that his the ability to adequately address stress, without more, is a disability requiring accommodation under the LAD.[11] Because the Court is dismissing Count VIII for violation of LAD, it does not reach Count XIV, asserting aiding and abetting violations of LAD, which is also dismissed.

### h. Hostile Education Environment

One of the elements of a hostile environment claim is that the plaintiff is the member of a protected class of persons and that the defendants were aware of his status as such. *See Lehman v. Toys R. Us, Inc.*, 132 N.J. 587, 604 (1993). The LAD prohibits discrimination based on "race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, genetic information, pregnancy, sex, gender identity or expression, disability or atypical hereditary cellular

---

[11] Although stress alone is likely not sufficient under the Americans with Disabilities Act, the LAD is read more permissively, and thus "stress disorders" may be covered by the LAD "which defines 'handicap' more broadly." *See Tynan v. Vicinage 13 of Superior Court*, 351 N.J. Super. 385, 398 (App. Div. 2002) (noting the plaintiff suffered from post-traumatic stress disorder and a number of other physical illnesses). Regardless, Plaintiff fails to make this argument and the Court will not address it *sua sponte*. While Plaintiff indicates that he suffered from stress, he fails to provide any cognizable diagnosis concerning his stress levels.

or blood trait . . ." N.J.S.A. 10:5-12.  As with the LAD claim, there is insufficient evidence that would preclude summary judgment, showing that Plaintiff was the member of a legally cognizable protected class.  Count IX is dismissed.

## IV.    Conclusion

For the reasons stated above, the Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.  Counts I only as to the procedural due process claim, II only as to the procedural due process claim, IV, V, VI, X, XI, and XII remain.  Counts III, VII, VIII, IX, XIII, and XIV are dismissed as are Counts I and II to the extent they do not rely on procedural due process.  An appropriate Order accompanies this Opinion

Dated: January 26, 2018

John Michael Vazquez, U.S.D.J.